649 A.2d 24

**Michael S. REUTER**

v.

**Nancy S. REUTER.**

**No. 527, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Oct. 11, 1994.

Reconsideration Denied Nov. 29, 1994.

Charles J. Muskin, Glen Burnie (Michael S. Reuter, Columbia, on the brief), for appellant.

Joel Marc Abramson and Harry B. Siegel, Columbia, for appellee.

Argued Before FISCHER, DAVIS and HARRELL, JJ.

DAVIS, Judge.

Michael S. Reuter (Mr. Reuter) appeals from a judgment of limited divorce entered by the Circuit Court for Anne Arundel

County (Lerner, J.). On March 17, 1993, Nancy Swisher Reuter (Mrs. Reuter) filed a complaint for limited divorce. The complaint requested relief *pendente lite,* and a hearing on those issues was held April 26. On May 20, the court (Goudy, J.) issued a *pendente lite* order which provided for Mr. Reuter's payment of child support and alimony.

On December 27, 1993, Mrs. Reuter filed a petition for contempt, alleging that Mr. Reuter was in arrearage for his support obligations under the *pendente lite* order. The contempt and limited divorce proceedings were consolidated, and a trial was held on February 23, 1994. At the close of trial the court granted the limited divorce, awarded Mrs. Reuter both alimony and child support, and ordered Mr. Reuter to pay both the arrearage and attorney's fees. A judgment of divorce was entered on March 15, and Mr. Reuter's motion to alter or amend that judgment was denied on March 25.

Mr. Reuter presents five questions for our review, which we have restated and renumbered for clarity:

I. Did the trial court err in finding that husband had voluntarily impoverished himself, and that he was capable of earning $45,000, when it failed to consider husband's last three years of income?

II. Did the trial court err when it awarded alimony to wife, when wife is the financially superior spouse, and when wife had refused without good cause to refinance the mortgage on the family home at a lower monthly rate?

III. Did the trial court err when it established husband's child support obligation?

IV. Did the trial court err when it awarded wife a $2,200 judgment for child support arrearage, when it failed to modify husband's *pendente lite* child support obligation to the amount required by the child support guidelines?

V. Did the trial court err when it awarded wife attorney fees and costs, when wife is the financially superior spouse with over $160,000 in available assets, and

when the trial court found that husband lacked the financial resources to pay the award promptly?

## FACTS

Nancy Swisher Reuter and Michael S. Reuter were married on July 11, 1981. They presently have two sons: Stephen (age 7) and Kevin (age 4). While the parties disagree about the circumstances surrounding their separation, it is not disputed that Mr. Reuter announced his intention to end the marriage relationship in November, 1992, and left the family home on January 23, 1993.

At the start of their marriage, Mrs. Reuter was employed full-time as a registered nurse. After Stephen was born in January, 1987, Mrs. Reuter returned to work part-time until 1988. Kevin was born in December, 1989, and Mrs. Reuter returned to work part-time in 1990. At the time of trial, Mrs. Reuter continued to work 10 hours per week as a nurse, at a rate of $16 per hour. In addition to her wages, Mrs. Reuter also receives a substantial amount of income from investments, and periodically has received income from a trust established by her father. Mrs. Reuter testified that the value of her assets was between $160,000 and $170,000, while the total taxable and tax-free income from those assets exceeded $7,000 per year.

In support of her decision to continue working part-time after the separation, Mrs. Reuter testified that Kevin was having difficulty adjusting to the separation. A clinical psychologist also testified about Kevin's emotional difficulties, and concluded that spending a full day in day care would not be in Kevin's best interest at this time.

Mr. Reuter began the marriage employed as a police officer. He attended law school in the evening, and was admitted to the bar in 1983. Between 1984 and 1991 Mr. Reuter was employed by a small law firm, first as an associate and later as a partner. In 1991, Mr. Reuter and Malik Tuma started the firm of Reuter & Tuma (the firm). In 1993, the firm added a

third partner and additional office space. Mr. Reuter's income from the firm was $39,366 in 1992, and $31,775 in 1993.

In 1994—just prior to trial—Mr. Reuter executed a "buy-sell agreement" in which his interest in the firm was sold to his partners for a net loss.[1] Mr. Reuter continued to work for the firm as an employee, and the firm has continued to use the name "Reuter, Tuma & Davis."[2] The buy-sell agreement carefully sets out Mr. Reuter's compensation for different types of cases, based on how the case is billed, and states that Mr. Reuter is not paid for his work until the firm receives payment.

The income and financial status of the parties is crucial to most of the questions presented in this case, and we discuss Mr. Reuter's employment history, as well as Mrs. Reuter's income and assets, in greater detail where appropriate.

Under the *pendente lite* order, Mr. Reuter's obligations for alimony and child support were $200 and $1,100 per month, respectively. Mr. Reuter paid the full amount at first, but in November, 1993, he began to make smaller payments, and by the February trial date he was $2,200 in arrears.

In granting Mrs. Reuter's petition for divorce, the trial court found that Mr. Reuter was voluntarily impoverished, and concluded that his potential income was $45,000. The court then ordered that Mr. Reuter pay $1,250 per month in child support, $100 per month in alimony, $4,000 in attorney's fees, and $203.50 in costs. Mr. Reuter was also ordered to maintain health insurance for Mrs. Reuter and both of the children. With regard to the $2,200 child support arrearage, Mr. Reuter

---

1. The agreement lists Mr. Reuter's equity interest in the firm as $16,-000, then subtracts the amount of two loans and one-third of the firm's outstanding payables, leaving him with a "net due equity interest" of –$94.11.

2. The "buy-sell agreement" provides that the firm name will not be changed until Mr. Reuter leaves the firm's employ or the current supply of letterhead is exhausted. Both Mr. Reuter and one of the firm's partners testified that neither clients nor creditors had been notified that Mr. Reuter was no longer a partner.

was ordered to make additional monthly payments until the arrearage was paid in full. The court requested—but did not order—that Mrs. Reuter supplement her income by increasing her work week from 10 hours per week to 15 hours or more.

## LEGAL ANALYSIS

As a preliminary matter, we reject Mrs. Reuter's assertion that the appeal should be dismissed for Mr. Reuter's failure to file a timely notice of appeal. On March 15, 1994, Mr. Reuter filed a motion to alter or amend the judgment pursuant to MARYLAND RULE 2–534. He then filed a notice of appeal on March 18—one full week before the court ruled on the earlier motion. Mrs. Reuter contends that the March 18th notice of appeal was ineffective because the court's judgment ceased to be final for purposes of appeal until the withdrawal or disposition of the Rule 2–534 motion. *See Unnamed Attorney v. Attorney Grievance Commission,* 303 Md. 473, 486, 494 A.2d 940 (1985). Mrs. Reuter's argument was correct under the former Rule 1012(d), but Maryland law on the point was changed in 1988 when Rule 1012 was amended and renumbered as Rule 8–202. *Edsall v. Anne Arundel County,* 332 Md. 502, 505–06, 632 A.2d 763 (1993). Under MARYLAND RULE 8–202, a timely notice of appeal filed prior to the disposition of a Rule 2–534 motion is effective. *Id.* Processing of the appeal is merely delayed until the withdrawal or disposition of the motion.

### I. Voluntary Impoverishment

Mr. Reuter's challenge of various orders contained in the divorce judgment rests heavily on his assertion that the lower court erred in finding that he was voluntarily impoverished, and that his potential income was $45,000 per year. In considering that question, we look to certain provisions of the statutory scheme that governs child support in Maryland, as set forth in the FAMILY LAW ARTICLE (FL) OF THE MARYLAND ANNOTATED CODE (1991 Repl.Vol.).

When a court calculates a parent's financial obligations under the child support guidelines, the central factual issue is the "actual adjusted income" of each party. The court must consider the "actual income of a parent, if the parent is employed to full capacity," FL § 12–201(b)(1), or the "potential income of a parent, if the parent is voluntarily impoverished." FL § 12–201(b)(2). Before an award may be based on potential income, the court must hear evidence and make a specific finding that the party is voluntarily impoverished. *John O. v. Jane O.*, 90 Md.App. 406, 423, 601 A.2d 149 (1992). Once a court reaches that conclusion, the court must then make findings regarding the factors related to potential income. *Goldberger v. Goldberger*, 96 Md.App. 313, 327–28, 624 A.2d 1328 (1993). Both issues are left to the sound discretion of the trial judge. The court's factual findings will not be disturbed unless they are clearly erroneous, *In re Joshua W.*, 94 Md.App. 486, 491, 617 A.2d 1154 (1993), and rulings based on those findings must stand unless the court abused its discretion. *John O.*, 90 Md.App. at 423, 601 A.2d 149.

In determining whether a parent is voluntarily impoverished, some factors to be considered include physical and mental condition, educational background, work history, efforts to find and retain employment, and the condition of the job market in the area where the parent lives. *John O.*, 90 Md.App. at 423, 601 A.2d 149. Those same five factors may also be considered when establishing a parent's potential income. *Goldberger*, 96 Md.App. at 327–28, 624 A.2d 1328. In ruling on the issue of voluntary impoverishment, the court may also consider:

(1) the timing of any change in employment or other financial circumstances relative to the divorce proceedings;

(2) the relationship between the parties prior to the initiation of divorce proceedings, and

(3) whether or not the parent has ever withheld support. *John O.*, 90 Md.App. at 423, 601 A.2d 149.

In the present case, the court heard extensive testimony on Mr. Reuter's prior work history and earnings; the

financial status of the firm; the circumstances surrounding the purported sale of his interest in the firm; and his brief financial history as an employee rather than partner. Mr. Reuter testified that the firm had been able to pay only low and inconsistent paychecks, which totalled $39,366 in 1992 and $31,775 in 1993. Nonetheless, the court also heard testimony that:

(1) Mr. Reuter earned $43,569 in 1988 and $56,800 in 1989 while working for a different firm;

(2) during 1993, Mr. Reuter received $4,900 in loans from the firm in lieu of receiving a paycheck;[3]

(3) Mr. Reuter had received gross paychecks totaling more than $10,000 during the first two months of 1994 (part of which had been earned in 1993);

(4) Mr. Reuter was due a one-third share of $50,000 in outstanding receivables billed by the firm in 1993;

(5) the firm's income for the first two months of 1994 was approximately $75,000—substantially higher than the firm's average monthly income for 1993; and

(6) the firm had deposited an estimated $28,000 in unearned retainers into its escrow account during the first two months of 1994, while Mr. Reuter had $13,000 in trust accounts for various clients.

The court also heard evidence that Mr. Reuter used a $6,000 paycheck received from the firm to pay a $3,300 credit-card bill and other expenses rather than paying his court-ordered support obligations in full, and that Mr. Reuter was $2,200 in arrears with regard to those obligations at the time of trial.

Mr. Reuter testified that he sold his interest in the firm because he "couldn't rely on the unpredictability of the amounts of money coming in, nor survive on what was coming in." Mr. Reuter also testified that he was actively seeking employment with the federal government or the attorney general's office. Nonetheless, there was sufficient evidence

---

3. Those loans were repaid under the buy-sell agreement by deducting the amount of the loan from Mr. Reuter's equity interest in the firm.

from which the trial court could reasonably conclude that Mr. Reuter had voluntarily impoverished himself by selling his interest in a firm whose partners could expect to make, in the trial court's words, "a substantial amount of money" during 1994.

As to the court's determination that Mr. Reuter's potential income was $45,000 per year, not all of appellant's arguments are well taken. Mr. Reuter argues that the court's view of the firm's future prospects, assuming he remained a partner, was purely speculative, and that such speculation cannot serve as the basis for a court's judgment (citing *John D. Copanos & Sons v. McDade Rigging and Steel Erection*, 43 Md.App. 204, 403 A.2d 402 (1979)). *Copanos & Sons* is not apposite here, as the ruling there involves a claim for lost profits as damages. *Id.* at 205, 403 A.2d 402. In some sense, any determination of "potential income" must necessarily involve a degree of speculation. *See Newman v. Newman*, 71 Md.App. 670, 676, 527 A.2d 61 (1987) (discussing speculation with regard to future income in context of alimony and a monetary award). So long as the court's factual findings are not clearly erroneous, MARYLAND RULE 8–131(d), the amount calculated is "realistic," *Goldberger*, 96 Md.App. at 328, 624 A.2d 1328, and the figure is not so unreasonably high or low as to amount to abuse of discretion, the court's ruling may not be disturbed. *John O.*, 90 Md.App. at 423, 601 A.2d 149. *Cf. Wolfe v. Turner*, 267 Md. 646, 653, 299 A.2d 106 (1973) (discussing abuse of discretion in context of attorney's fees).

Mr. Reuter also challenges the evidence considered by the court in determining his potential income. He argues that the trial court's inquiry into his prior earnings was limited by statute to the previous three years, and hence the trial court erred in considering his substantially higher earnings from 1988 and 1989. In support of that proposition Mr. Reuter points to FL § 12–203(b), which states:

> (b) *Verification of income.*—(1) Income statements of the parents shall be verified with documentation of both current and past actual income.

(2)(i) Except as provided in subparagraph (ii) of this paragraph, suitable documentation of actual income includes pay stubs, employer statements otherwise admissible under the rules of evidence, or receipts and expenses if self-employed, and copies of each parent's 3 most recent federal tax returns.

(ii) If a parent is self-employed or has received an increase or decrease in income of 20% or more in a 1–year period within the past 3 years, the court may require that parent to provide copies of federal tax returns for the 5 most recent years.

Mrs. Reuter argues that FL § 12–203 applies only to verification of actual income, and has never been interpreted to restrict the court in its task of determining potential income.

When addressing the meaning and application of statutory provisions, the statutory scheme must be examined as a whole, and the relationship between its various provisions must be considered. *Vest v. Giant Food Stores,* 329 Md. 461, 466–67, 620 A.2d 340 (1993). The larger context must also be considered, including the legislative purpose. *Baltimore Cty. C.A.U.T. v. Baltimore Cty.,* 321 Md. 184, 203–04, 582 A.2d 510 (1990). The range of a statute's reach must be consistent with the plain meaning of the words and the structure of the statutory scheme. *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590 (1992). In light of those considerations, it is clear that the provisions relating to tax returns apply only to "documentation of both current and past actual income," FL § 12–203(b)(1), and not to potential income.

We are mindful that the statutory scheme sometimes uses the phrase "adjusted actual income" to include "potential income." The child support guidelines, for example, provide that child care expenses "shall be divided between the parents in proportion to their adjusted actual incomes." FL § 12–204(g). It should be obvious, however, that a parent's "potential income" is not the type of fact which is capable of being "verified," through documentation or otherwise; hence FL § 12–203 does not apply. That conclusion is consistent with

the statutory definition of "potential income," which provides that potential income is determined by "the parent's employment potential and probable earnings level *based on, but not limited to, recent work history*" and other stated factors. FL § 12–201(f) (emphasis added).

Construction of a statute that is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177 (1990). A construction that is unworkable must likewise be rejected. The facts underlying several of our cases demonstrate that the application of FL § 12–203 to voluntarily impoverished parents would unreasonably restrict the court's determination of potential income. In the case of *In re Joshua W.*, the voluntarily impoverished parent was attending graduate school at the time of trial and had previously worked as a car salesman, a pastor, and a technical writer. 94 Md.App. at 492–93, 617 A.2d 1154. In *Goldberger*, the impoverished parent had been a Talmudic student for all of his adult life, and was supported by the contributions of family members and others in his community. 96 Md.App. at 322, 624 A.2d 1328. In either of these cases, restricting the trial court's inquiry to income from recent years might well prevent the court from considering the most probative evidence on a parent's earning potential. In a case such as *Goldberger*, where the parent maintained a steady but impoverished income for more than three years, the court would be entirely precluded from considering any income earned at a time when the parent was employed to full capacity.

The time of low tide at Ocean City on a particular day is a fact that is capable of being "verified"; so, too, is a spouse's actual income. An impoverished spouse's potential income is not, and the rules pertaining to verification of actual income do not apply. Having ruled that a parent is voluntarily impoverished, the court may consider any admissible evidence in determining potential income.

We are puzzled, however, as to how the trial judge arrived at the conclusion that Mr. Reuter's potential income should be

$45,000 per year, based on the record evidence before him.
The judge explained, in his oral opinion:

> "You've [the firm] got a gross of a hundred and ninety
> thousand dollars [in 1992], and then there's a gross of two
> hundred and eighty-six thousand dollars [in 1993] . . . you've
> got a substantial amount of money coming to you on these
> two months [apparently referring to approximately $13,000
> attributable to appellant in the firm's escrow account and
> approximately $18,000 as appellant's share of accounts re-
> ceivable for January and February 1994] . . . But the fact is
> that I guess on average, uh, you're making at least forty-
> five thousand dollars . . . that's what I've computed in the
> way of income to you."

* * * * * *

> " . . . in '89 you earned fifty-six thousand, eight hundred
> dollars . . . One year you made forty-one thousand [1990],
> one year you made fifty-six [1989], one year you made forty-
> three thousand, five sixty-nine [1988]. And so I think . . . I
> really believe that in looking over this thing that you really
> are capable of earning forty-five thousand dollars. I don't
> think there's any two ways about it."

As we have acknowledged earlier, determining imputed in-
come necessarily involves some speculation. Merely setting
out a string of numbers, however, does not provide a rational
basis for even the level of permissible speculation under the
circumstances.

The judge initially noted an increase of $96,000 in the law
firm's gross from 1992 to 1993. In those same years, appel-
lant's income decreased from $39,366 to $31,775. It was not
until 1994 that the so-called buy-sell agreement was executed
and ostensibly took effect. As to the judge's consideration of
monies due from or received by appellant from the law firm in
1994, the evidence showed that Mr. Reuter had received
$10,570 from the firm in January–February 1994. He was
also entitled to approximately $13,000 in escrowed monies if,
as, and when earned. The approximately $18,000 potentially
attributable to appellant's share of $50,000 in accounts receiv-

able was dependent on the assumption that 100% of the unaged accounts would be collected. In a practice that was admittedly heavily dependent on family law cases, one may question this underlying, rosy assumption with regard to the collection of the accounts. Even assuming the best case scenario for appellant, that is, that the January–February income experience ($10,570) would replicate itself for each remaining two-month period in 1994, the projected annual income would far exceed $45,000. We have no clue on this record how the trial judge could have discounted this to $45,000.

The average of appellant's incomes for the five-year period, 1989–93, was $38,893. The average for the latter three years, 1991–93, was $31,921. We fail to discern how these trends lead to the conclusion that the judge reached.

It may be that the judge, on remand, can better explain the basis for his conclusion of "on average ... [appellant is] making at least forty-five thousand dollars." We shall give him that opportunity.

## II. Alimony

Mr. Reuter's second broad theme is that the trial court erred in considering Mrs. Reuter's income and assets. We begin our examination of that question in the context of alimony, and continue it later when we address the calculation of Mr. Reuter's child support obligation under the guidelines.

In awarding Mrs. Reuter $100 per month in alimony, the trial court stated:

> Now, the question comes down, is Mrs. Reuter not doing her share? I really do believe Mrs. Reuter could do a little better. I mean, I think she can do better than ten hours a week. And I do think she should seek, uh, uh, additional hours. I know she said there was some testimony that she sought some additional hours. It seems to me—I don't think you can just sit back and just close your eyes to this thing. Even if it's fifteen hours a week, add another few

hours on to try to stabilize this thing. These poor children, they're young yet ...

And so, I going—I'm going to—I'm going to order that she—that she get a hundred dollars alimony a month, and that will make it thirteen hundred and fifty dollars. But, uh, I really do believe that she can do better. Now, it seems to me that the only evidence I've heard is from the parties that they're—they're in pretty good health both of them, at least I observe that. This is a marriage of, uh, of, uh, twelve, thirteen—twelve years, thirteen years. You got these two young children. This is the income that you have, the circumstances in—in this case. It really appears to me that the only fault in this divorce is the fault of Mr. Reuter. He's the one who, uh, left. Obviously fell out of love. Mrs. Reuter was not that keen on a separation in this case. And, uh, in taking all these—all this—all of this into—into consideration that's how I arrived at—at giving her a hundred dollars a month, to at least try to stabilize her and help her out. And—and that money will continue until, uh—let's see what the future holds.

Mr. Reuter contends that the trial court erred because Mrs. Reuter is the "financially superior spouse," and because she had refused, without good cause, to agree with his proposal to refinance the mortgage on the family home at a lower interest rate.[4] Citing *Hull v. Hull,* 83 Md.App. 218, 574 A.2d 20 (1990), Mr. Reuter concludes that an award of alimony for the purpose of rehabilitation was unnecessary in this case.

▌ In *Hull v. Hull,* we recognized that an award of alimony is composed of two distinct questions. The twelve "required considerations" outlined in FL § 11–106(b) address themselves only to the *amount* of an award; before reaching

---

4. The proposed refinancing deal provided a lower rate of interest for the first three years only; thereafter, the rate would be higher. The merits of such a proposal present a complex question of fact and opinion, and reasonable experts would undoubtedly disagree. The trial court was plainly aware of Mrs. Reuter's refusal to refinance the home, and we cannot say that the court abused its discretion by awarding alimony in spite of that refusal.

those considerations, the court must first determine that an award of alimony is warranted. *Id.* at 220–221, 574 A.2d 20. Where the award is temporary rather than permanent, the sole purpose of alimony is the rehabilitation of the recipient spouse. *Id.* at 223–24, 574 A.2d 20. The award must be grounded in a finding that the recipient spouse is not self-supporting and that training, education or other steps are necessary to help the recipient achieve financial self-reliance. *Id.* *See James v. James,* 96 Md.App. 439, 457–58, 625 A.2d 381 (1993). An alimony award will not be disturbed on appeal unless the trial court abused its discretion or rendered a judgment that was clearly wrong. *Tracey,* 328 Md. at 385, 614 A.2d 590.

Applying our two-step analysis from *Hull* and the proper standard of review, Mr. Reuter's objections to the award may be summarized in the following manner:

1. The trial court erred in ruling that alimony was appropriate, because:

 a) Mrs. Reuter was capable of being self-supporting by working longer hours,

 b) Mrs. Reuter was capable of being self-supporting by liquidating some portion of her investment assets, and

 c) the court's ruling was based on erroneous findings of fact with regard to Mrs. Reuter's income.

2. The trial court erred in determining the amount of the alimony award, because:

 a) the amount of the award was based on erroneous findings of fact with regard to Mrs. Reuter's income, and

 b) the court abused its discretion in light of Mr. Reuter's debts and Mrs. Reuter's assets.

While we are unable to conclude that the court did not abuse its discretion for the reasons previously discussed as to Mr. Reuter's potential income, we nonetheless hold that the trial court erred as to Mr. Reuter's income. Both of the questions that we identified in *Hull* require the court to make specific findings of fact with regard to the income of the recipient spouse. The court failed to make those findings. As we note

in detail below, there is evidence that the court used a clearly erroneous estimate of Mrs. Reuter's actual income in completing the child support guidelines. We discuss the matter fully in the context of child support; for now, we simply note that the alimony award was not properly grounded in the necessary findings of fact.

On the basis of that error, the alimony award is vacated and remanded. A full explanation of our ruling, however, requires that we consider the questions Mr. Reuter raises with regard to Mrs. Reuter's part-time employment and assets.

■■ *Mrs. Reuter's part-time employment.*—In determining whether alimony is necessary for the purpose of rehabilitation, the court must consider the income and expenses of the petitioning spouse, as well as the potential for suitable employment through training or other means. *See Coviello v. Coviello,* 91 Md.App. 638, 643–44, 605 A.2d 661 (1992). While the twelve required considerations detailed in FL § 11–106(b) are directed only to the amount of the award, the trial court is not precluded from addressing equitable concerns when concluding that a spouse is not self-supporting.

The role that equitable concerns may play in that determination is underscored by *Tracey v. Tracey,* 328 Md. 380, 614 A.2d 590 (1992). At the time of trial, Ruth Tracey was working two jobs: a full-time job as a government payroll clerk, and a part-time job at McDonald's. *Id.* at 383, 614 A.2d 590. In granting an award of indefinite alimony, the trial court concluded that Ms. Tracey was not required to work a second job, and the Court of Appeals affirmed. *Id.* at 389–90, 614 A.2d 590. After considering the statute as a whole and reviewing the legislative history, the Court declared that "the paramount goal of the legislature was to create a statutory mechanism leading to equitably sound alimony determinations...." *Id.* at 388, 614 A.2d 590. In concluding that "the alimony statute does not consign Ruth to an existence of unremitting toil," *id.* at 390, 614 A.2d 590, the court recognized that trial judges are empowered by the statute to reach a fair and equitable result based on a particular set of facts. *Id.* at

389, 614 A.2d 590. *See also Blaine v. Blaine,* 336 Md. 49, 66–67, 646 A.2d 413 (1994).

If Mrs. Reuter were required to work full-time, it is undisputed that she would be self-supporting at an income level very close to Mr. Reuter's past and potential income. Mr. Reuter's vocational expert testified that Mrs. Reuter was presently qualified for a variety of nursing jobs with pay in the range of $35,000 to $45,000 per year. With a modest amount of retraining and recertification, Mrs. Reuter would also be qualified for the many available jobs that require clinical experience, at a salary of $36,000 per year. But the issue, as framed by the trial court, is whether Mrs. Reuter is *required* to act contrary to the best interests of her child in order to be self-supporting. The court ruled that she was not, and we agree.

Our conclusion is not foreign to the concept of rehabilitative alimony. The UNIFORM MARRIAGE AND DIVORCE ACT, adopted in whole or in part by at least eight states, provides that a court may award alimony where it finds that the spouse seeking maintenance "is the custodian of a child whose age or condition make it appropriate that the custodian not be required to seek employment outside the home." UNIFORM MARRIAGE AND DIVORCE ACT, 9A U.L.A. § 308, 347–348 (West 1987); *see, e.g.,* ARIZ.REV.STAT.ANN. § 25–319(a)(2) (1991) (containing similar language). Our own statute on alimony was drafted by the Governor's Commission on Domestic Relations Laws, and the subject of alimony was discussed extensively in the Commission's 1980 report. We find nothing in that report to indicate that the Commission rejected the broader concept of rehabilitative alimony embodied in the Uniform Act; indeed, such a reading would be contrary to the importance the Commission gave to the role of trial judges, when sitting as a court of equity, to make a fair and just award. *Tracey,* 328 Md. at 388–89, 614 A.2d 590.

The lesson of *Tracey* is that the trial court may not require a spouse to take unreasonable steps in order to become self-supporting. The law and policy of this State is

that the child's best interest is paramount. *See Shrivastava v. Mates,* 93 Md.App. 320, 327, 612 A.2d 313 (1992) (discussing that interest in context of child support). In the context of custody, for example, "the court's overriding responsibility is to protect the best interests of the child." *Robinson v. Robinson,* 328 Md. 507, 518, 615 A.2d 1190 (1992) (citing *Ross v. Hoffman,* 280 Md. 172, 174–75, 372 A.2d 582 (1977). In the case at hand, the court heard unrefuted expert testimony that "a full day away from the mother would not be in the child's best interest." The court did not abuse its discretion when it concluded that Mrs. Reuter was not required to work full-time in order to become self-supporting.

 *Mrs. Reuter's investment assets.*—In light of Mrs. Reuter's part-time employment, Mr. Reuter's potential income was substantially higher than her actual income (notwithstanding the income from her investments). Conversely, Mrs. Reuter had substantial investment capital (in excess of $160,000), while Mr. Reuter had virtually no assets other than his interest in the marital home. He also testified that he incurred between $10,000 and $12,000 in debts while trying to pay support under the *pendente lite* order, although we note that some of those debts ($3,300 in credit-card debt, for example) may have been paid at the time of trial. On the basis of his debts and Mrs. Reuter's assets, Mr. Reuter argues that she was "financially superior," and that an award of alimony was improper because Mrs. Reuter can and should be required to liquidate some of her assets in order to be self-supporting.

In prior cases, we have ruled that a spouse is not *required,* as a matter of law, to liquidate assets before an award of alimony may be made. *See Wassif v. Wassif,* 77 Md.App. 750, 756–58, 551 A.2d 935 (1989) (holding that court did not abuse its discretion in awarding alimony to spouse who owned $500,000 interest in marital home and numerous condominium properties); *cf. Rogers v. Rogers,* 80 Md.App. 575, 594, 565 A.2d 361 (1989) (holding that court abused its discretion in denying attorney's fees to spouse with cash assets totalling

$65,000). The amount, if any, that a spouse may be required to contribute is within the discretion of the trial court. In the present case, we must remind ourselves of the reason why Mrs. Reuter is unable to be self-supporting: her minor child— *Mr. Reuter's* minor child—is in need of her care and attention, and she has agreed to shoulder that burden. While an award of alimony must be grounded in the conclusion that the recipient spouse is not self-supporting, *Hull,* 83 Md.App. at 223, 574 A.2d 20, the legislature intended the trial judge to exercise considerable equitable discretion in reaching that conclusion. *Tracey,* 328 Md. at 389, 614 A.2d 590. Equity does not require that a spouse liquidate her assets in order to receive an award of alimony, and the court did not abuse its discretion in ruling that Mrs. Reuter was not self-supporting despite her investment assets.

Our conclusion is strongly supported when we examine the amount of the alimony award in light of Mrs. Reuter's income and expenses. Because we accept the trial court's determination that Mrs. Reuter is not required to work full-time, it is not disputed that her expenses considerably exceed her income. By the court's calculations, Mrs. Reuter's income (other than alimony) was approximately $1,167 per month ($14,000 per year), to which we add $1,250 per month for child support for a total of $2,417. The list of expenses submitted by Mrs. Reuter totals $3,456 per month, leaving a deficit of more than $1,000 per month. In exercising its discretion, the court asked Mr. Reuter to contribute only one-tenth of that amount. The balance—$900 per month—must be paid by Mrs. Reuter through some combination of increased employment and the depletion of her assets.

■ ***Guidance on remand.***—In granting Mrs. Reuter alimony under the facts of this case, the trial court did not abuse its discretion. At best, the court failed to make the necessary findings of fact; at worst, the court used a clearly erroneous figure for Mrs. Reuter's income. We remand the case for a redetermination of Mrs. Reuter's actual income, and a reconsideration of the petition for alimony in light of those findings.

We also direct the trial court's attention to one further matter. In its January, 1980 report, the Governor's Commission on Domestic Relations Laws noted that "the award of alimony in the ordinary case should be for a specific time, and that time should be stated in the order." Accordingly, FL § 11–106(a) provides that the court shall determine "the amount of *and the period for* an award of alimony" (emphasis added). It is essential to recognize that an award of alimony is appropriate in this case *only* because Kevin's special needs require Mrs. Reuter's attention. In time, Kevin's needs will change. They may change because Kevin has grown more secure and has become less dependent, and Mrs. Reuter's full-time employment is no longer contrary to his best interests. They are certain to change when Kevin reaches the age where full-time attendance at school is required. The duration of any award should be limited accordingly.

### III. Child Support

We have already addressed two of Mr. Reuter's challenges to the child support award. As we have noted, the court did not adequately explain how it determined that Mr. Reuter's potential income was $45,000. It did not err in concluding that Mrs. Reuter was not required to work full-time.[5] Leaving aside those matters, Mr. Reuter makes additional claims which may be summarized as follows:

1. The court's findings of fact with regard to Mrs. Reuter's income were clearly erroneous because the court failed to properly consider her investment income.
2. The court's findings of fact with regard to work-related child care expenses were clearly erroneous.
3. After ordering that Mr. Reuter provide health insurance coverage for the children at his expense, the court erred by failing to deduct that cost from his income as required by FL § 12–201(d)(3).

While we cannot agree with Mr. Reuter's conclusion that the guidelines require an award of roughly $650, we find some

---

**5.** In effect, the court ruled that Mrs. Reuter was not voluntarily impoverished, notwithstanding her part-time employment. For the reasons we noted above, the court did not abuse its discretion in reaching that conclusion.

merit in these last three arguments.

The adoption of the child support guidelines contained in FL § 12–201 *et seq.* was intended to restrict the equitable discretion of the trial court and produce an award of support that is grounded in "specific descriptive and numeric criteria." *Voishan v. Palma,* 327 Md. 318, 322, 609 A.2d 319 (1992). In using the guidelines, the court first must determine the adjusted actual income of each parent, FL § 12–201(d), as well as the expenses incurred on behalf of a child for work-related child care, extraordinary medical expenses, school, and transportation between the homes of the parents. FL § 12–204(g)–(i). The court must also make note of preexisting child support obligations actually paid, alimony awarded, and the cost of providing health insurance coverage for a child. FL § 12–201(d). Having made those findings of fact, application of the guidelines is a straightforward mathematical exercise. *Gates v. Gates,* 83 Md.App. 661, 666–67, 577 A.2d 382 (1990). There is a rebuttable presumption that the amount of support resulting from the application of the guidelines is the correct amount, FL § 12–202(a)(2)(i) and a greater or lesser amount may not be awarded unless the court makes specific findings (either written or on the record) that application of the guidelines would be unjust or inappropriate. FL § 12–202(a)(2)(ii).

The trial court's award of child support may be challenged on several grounds. An aggrieved party may allege the numbers obtained in the court's preliminary fact-finding were not supported by evidence and were clearly erroneous. MARYLAND RULE 8–131(c). A party may also allege that the calculations were performed incorrectly. *Tannehill v. Tannehill,* 88 Md.App. 4, 16, 591 A.2d 888 (1991). Finally, a party may contend that the court abused its discretion by making an award inconsistent with the guidelines, or that it failed to support its departure from the guidelines with the specific findings required by FL § 12–202(a)(2). *Tannehill,* 88 Md. App. at 15, 591 A.2d 888.

In the present case, the trial court awarded Mrs. Reuter $1,250 per month in child support. We have carefully examined both the trial transcript and the record, and find that we cannot determine how the court arrived at that figure. There are no findings of fact stated on the record, with regard to

gard to the cost of work-related child care, extraordinary medical expenses, school expenses, or Mr. Reuter's cost for health insurance coverage.

The record does not contain a child support worksheet signed by the court, but there is a worksheet prepared and signed by Mr. Reuter's attorney. A second set of unsigned calculations are written in the margins. Those calculations are written in a different hand, but we cannot confidently ascribe them to the court. The total obligation calculated in the margins is $1,278, and the transcript reveals that that total precisely matches the total calculated by Mrs. Reuter's attorney.

The record lacks a definitive basis for our review. We cannot determine whether the court's findings of fact were clearly erroneous, nor can we determine whether the court properly made the required calculations. We must, therefore, vacate the award and remand for further proceedings. *Odunukwe v. Odunukwe*, 98 Md.App. 273, 285, 633 A.2d 418 (1993). Nonetheless, it is clear from the evidence presented at trial that the court simply could not have calculated a child support obligation of $1,250 without making clearly erroneous findings of fact or mathematical errors.[6] There is evidence in

---

6. Upon reviewing the transcript, it appears that the court could not have properly used a figure lower than $16,613 for Mrs. Reuter's adjusted actual income ($8,000 in wages, $7,413 in investment income, and $1,200 in alimony). Similarly, the court could not have used a figure higher than $43,800 for Mr. Reuter's adjusted actual income ($45,000 in potential income less alimony paid). If we calculate Mr. Reuter's basic child support obligation from those figures, we get the following:

| | | |
|---|---|---|
| Mrs. Reuter's adjusted actual income: | 1,384.42 | per month |
| Mr. Reuter's adjusted actual income: | 3,650.00 | per month |
| Combined adjusted actual income: | 5,034.42 | per month |
| Mr. Reuter's share of combined income: | 72.5 | percent |
| Combined basic child support obligation: | 1,051.00 | per month |
| Mr. Reuter's share of same: | 761.98 | per month |

Mr. Reuter's basic child support obligation would be lower if a higher figure were used for Mrs. Reuter's income, or if the cost of dependent health coverage was properly deducted from his income. In order to bring Mr. Reuter's total obligation to $1,250 per month, the court would need to find an additional $673 per month (or more) in child care, school, and extraordinary medical expenses. The record does not support such a finding.

the transcript to suggest that the court erred with regard to the cost of work-related child care, Mr. Reuter's adjusted actual income, and Mrs. Reuter's adjusted actual income. Before offering the court guidance on remand, we discuss the apparent errors in some detail for the benefit of the court and the parties.

*Work-related child care.*—Mrs. Reuter testified that while Stephen was in school she paid child care for Kevin only at $30 per week, which totals $130 per month. In his brief, Mr. Reuter proposes that the child care expenses should have been calculated at $206 per month (including care for Stephen during the summer), and Mrs. Reuter's brief accepts that figure.

The transcript reveals that substantially higher figures were discussed while the court was calculating Mr. Reuter's child support obligation. Mrs. Reuter's attorney proposed $470 per month, while Mr. Reuter's attorney offered $550. Both figures are based on the assumption that Mrs. Reuter would be required to work full-time. While the court does not state which figure it used, both are clearly erroneous, and there is no discussion at trial as to what the total would be if Mrs. Reuter continued to work part-time.

*Mr. Reuter's adjusted actual income.*—In calculating Mr. Reuter's adjusted actual income, the court must deduct the amount of alimony awarded and the cost of providing health care coverage for the children. FL § 12–201(d). It was noted at trial that the firm was responsible for Mr. Reuter's dependent health care coverage through June 30, 1994; after that date, dependent coverage is at Mr. Reuter's expense. While Mr. Reuter's expense sheets list $300 as the cost of dependent coverage, there was no discussion of that figure at trial. The court made no findings as to the cost of coverage, and there is no evidence that the court deducted such costs from his actual income.

*Mrs. Reuter's adjusted actual income.*—In calculating a parent's adjusted actual income, the court is obliged to include wages, dividends, interest, and trust income. FL § 12–

201(c)(3). Alimony awarded by the court is also included in actual income. FL § 12–204(a)(2)(ii). Pursuant to FL § 12–203(b)(1), the income statements of parents "shall be verified with documentation of both current and past actual income." Suitable documentation may include the parent's three most recent federal tax returns, as well as other admissible evidence. FL § 12–203(b)(2)(i).

Mrs. Reuter testified that her 1993 income was $14,000: $8,000 in wages, and $6,000 in dividends and interest. Mr. Reuter later testified, with Mrs. Reuter's tax documents in front of him, that her 1993 investment income totalled $7,413.79 in interest and dividends. Mrs. Reuter's income during 1992 was substantially higher. She testified that she received $7,263 in taxable investment income that year, as well as $1,445 in tax-free investment income and approximately $3,000 from her father's trust. Mr. Reuter testified that Mrs. Reuter received $3,623.10 from the trust in 1992, and higher amounts in 1989, 1990, and 1991.

On the basis of those figures, Mrs. Reuter's 1993 income appears to be at least $15,413. It may have been higher, as there was no testimony concerning tax-free income for that year. For 1992, Mrs. Reuter's actual income appears to be in excess of $21,000.

While the court's oral opinion makes no specific findings of fact with regard to Mrs. Reuter's income, the transcript does contain the following exchange, in which the court questioned her about her income:

THE WITNESS: I made eight thousand at my job last year.

THE COURT: Eight thousand from your job.

THE WITNESS: And about—eight thousand. And about—

THE COURT: And how much from investments?

THE WITNESS: —six thousand from—

THE COURT: Six thousand from investments. Total of fourteen thousand dollars?

THE WITNESS: Right.

THE COURT: Okay.

We cannot say for certain that the court used $14,000 as Mrs. Reuter's actual income. Nonetheless, it is plain that the figure is clearly erroneous, and that the court failed to make the necessary findings of fact.

*Guidance on remand.*—As a practical matter, the calculation of child support simply requires the court to "fill in the blanks" on the child support worksheet issued by the Court of Appeals pursuant to FL § 12–203(a). To ensure the accuracy of the calculations and provide this Court with a basis for review, it is essential that the trial court make findings of fact with respect to each of the numbers used in its calculations. On remand, the court should make specific factual findings on the record with respect to the adjusted actual (or potential) income of each parent, the cost (if any) of health care coverage for the children, and the costs for child care, extraordinary medical expenses, school, and transportation. While the court is not required to make separate findings of fact for each source of income, it may be helpful to the court and the parties to make separate findings with respect to Mrs. Reuter's wages, taxable income from investments, non-taxable income from investments, and income from the trust fund. The court's findings with regard to Mrs. Reuter's income must be grounded in suitable documentation as required by FL § 12–203(b). In the case of non-wage income, suitable documentation may include tax-related records, correspondence or an affidavit from a trustee, and other probative evidence.

Having made the required findings of fact, the court should then recalculate Mr. Reuter's child support obligation under the guidelines, and proceed as required by FL § 12–202(a) with regard to the use of or departure from the guidelines.

### IV. Modification of the *Pendente Lite* Award

Following an emergency hearing in April of 1993, the court issued a *pendente lite* order granting Mrs. Reuter alimony and child support in the amounts of $200 and $1,100

per month, respectively. Mr. Reuter filed a timely motion for reconsideration and requested a hearing. No hearing was held, and the motion was denied on June 29, 1993. Mr. Reuter made no further legal challenge to the order until his answer to Mrs. Reuter's petition for contempt. Mr. Reuter now contends that the court erred in failing to retroactively modify the *pendente lite* order in accordance with the child support guidelines. In his closing argument at the February 23 trial, counsel for Mr. Reuter stated:

> And I ask this Court to make that ruling [on child support] retroactive to when we asked for this hearing. We came in in November hoping to get a hearing to get this reduced and we weren't able to do so because of the docket [sic] which this Court is familiar.

The court made its order of alimony and child support effective February 1st.

Under the pressure of federal legislation, Maryland and other states have adopted strict rules on the retroactive modification of child support awards. Federal law dictates that states will not be eligible for federal funds through the Aid to Families with Dependent Children (AFDC) program unless they adopt certain rules and procedures governing the enforcement of child support orders. The required procedures must provide that "any child support order" is "a judgment by operation of law, with the full force, effect, and attributes of a judgment...." 42 USC § 666(a)(9). The federal statute further requires that an award may not be subject to retroactive modification, except that modification is permitted "with respect to any period during which there is pending a petition for modification, but only from the date that notice of such petition has been given...." *Id.* The Maryland statutes governing modification of child support awards have been amended to bring Maryland law into compliance with these requirements.

Our child support statutes provide that a court may not modify a child support award except upon "the filing of a motion for modification and upon a showing of a material

change of circumstances." FL § 12–104(a). MARYLAND RULE 2–311 requires that motions be made in writing, unless they are made during a hearing or trial. The court may not retroactively modify an award prior to the date that a motion was filed. FL § 12–104(b).

There is no provision in the statute for modification of an award based on the improper use of the guidelines. The absence of such a provision may be illustrated by comparison with the laws of Connecticut, which provide that any order for the payment of child support, whether permanent or *pendente lite*, may be modified "upon a showing of a substantial change in the circumstances of either party *or upon a showing that the final order for child support substantially deviates from the child support guidelines....*" CONN.GEN.STAT.ANN. § 46b–86(a) (West 1994) (emphasis added). *See also Turner v. Turner*, 219 Conn. 703, 595 A.2d 297, 301–05 (1991) (discussing and interpreting the Connecticut statute in light of its legislative history).

■ The Maryland rule allowing modification only upon a showing of changed circumstances is consistent with broader principles of *res judicata*. As we recently noted in regard to the modification of an alimony award, the doctrine of *res judicata* dictates that the parties may not relitigate matters that were or should have been considered at the time of the initial award. *Lieberman v. Lieberman*, 81 Md.App. 575, 597, 568 A.2d 1157 (1990). *See Blaine v. Blaine*, 336 Md. 49, 70, 646 A.2d 413 (1994). A *pendente lite* award, of course, may also be modified in accordance with the guidelines at the time that a final award is made. In that situation, a showing of material change is not required, but *only* because the order granting a divorce terminates the *pendente lite* award. *Payne v. Payne*, 73 Md.App. 473, 481–82, 534 A.2d 1360 (1988). Because the *pendente lite* order is terminated, and a new order granted, the *pendente lite* order may not be retroactively modified in this manner.

Mr. Reuter may have hoped to "get this thing reduced," but hoping is not a motion. We have searched the record in vain

for any sign that he filed such a motion. His "Answer to Petition for Contempt" comes close: therein, Mr. Reuter alleges that the *pendente lite* order "directs the Defendant to pay a child support obligation which is twice the amount set forth in the Child Support Guidelines." Nonetheless, Mr. Reuter requests only that the petition be dismissed, and that the court grant "such other and further relief as the nature of his cause may require." There is no express request for modification of the *pendente lite* order.

Even if we assume that such a motion was made, it could not have been granted on the objections that Mr. Reuter presents. Given the importance that both Congress and the Maryland legislature have placed on adherence to the child support guidelines, the rule adopted by Connecticut may well be a commendable addition to our child support laws. This court, however, is powerless to enact it.

A final child support order is a new award; hence, a *pendente lite* order may be *prospectively* "modified" at the time that a final award is made without a showing of changed circumstances. *Payne*, 73 Md.App. at 481–82, 534 A.2d 1360. It may not be *retroactively* modified except as provided by FL § 12–104. Under no circumstances, however, is retroactive modification required. As we explained in *Krikstan v. Krikstan*, 90 Md.App. 462, 473, 601 A.2d 1127 (1992), a spouse "possesses no right to restitution or recoupment following a modification of support; it is within the discretion of the chancellor to determine whether to make the award retroactive to the time of filing." *See also Barr v. Barr*, 58 Md.App. 569, 588, 473 A.2d 1300 (1984) (holding that parent who "overpays" has no right to recoupment because that would presumably deprive the child of benefits already received).

The *pendente lite* order was *res judicata* with regard to Mrs. Reuter's petition for contempt, and the court did not err when it ordered Mr. Reuter to pay the arrearage in full.

### V. Attorney's Fees

Two separate sections of the FAMILY LAW ARTICLE grant the trial court the discretion necessary to make an

award of attorney's fees and costs in this case. In an alimony proceeding, the court may award either party the "reasonable and necessary expense of prosecuting or defending the proceeding." FL § 11–110(b). In a case involving child support, the court may award either party "the costs and counsel fees that are just and proper under all the circumstances." FL § 12–103(a). In either event, the court is required to consider the financial resources of each party, the needs of each party, and whether there was a substantial justification for bringing or defending the proceeding. FL § 11–110(c); FL § 12–103(b). The court's exercise of discretion must be based on the statutory criteria and the facts of each case, and we will not disturb the award on appeal unless the court's discretion was exercised arbitrarily or the judgment was clearly wrong. *Broseus v. Broseus*, 82 Md.App. 183, 199–200, 570 A.2d 874 (1990).

At trial, Mrs. Reuter submitted a bill for $9,449.50 in attorney's fees. The divorce judgment ordered Mr. Reuter to pay $4,000 of that total, plus $203.50 in deposition costs. Collection of the fee award was stayed until the sale of the marital home.

In contesting the fee award, Mr. Reuter broadly contends that the trial court failed to consider the factors set forth in the statute. *See Carroll County Dep't of Social Services v. Edelmann*, 320 Md. 150, 177, 577 A.2d 14 (1990). More specifically, Mr. Reuter makes three arguments. First, he incorporates all of the arguments previously made regarding Mrs. Reuter's superior financial status and his own financial hardship. Second, Mr. Reuter contends that his own request for a hearing was justified, and that Mrs. Reuter's litigation of the child support issue was without justification because she "prevented settlement of the child support issue." Finally, Mr. Reuter notes that the court "affirmatively acknowledged that Mr. Reuter had no financial resources" when it stayed collection of the attorney's fees until the sale of his interest in the marital home.

We are not persuaded that the trial court abused its discretion in this case. We have previously held that a spouse is not *required*, by law, to liquidate assets before an award of attorney's fees may be made. *Rogers*, 80 Md.App. at 594, 565 A.2d 361 (holding that court abused its discretion in denying attorney's fees to spouse with cash assets totalling $65,000). *Cf. Wassif*, 77 Md.App. at 756–78, 551 A.2d 935 (holding that court did not abuse its discretion in awarding alimony to spouse who owned $500,000 interest in marital home and numerous condominium properties).

We presume that the trial judge knows the law, and there is no indication in the record that the court was not aware of the statutory factors. *See Fox v. Fox*, 85 Md.App. 448, 463–64, 584 A.2d 128 (1991). Where the reasons underlying an award are not expressly articulated, we look to the record as a whole to garner support for the court's decision. *Id.* After several hours of testimony, much of which pertained to income and assets, the court was well aware of the financial circumstances of the parties.

We have previously recognized that the "needs of each party" may include the illness of a spouse, as well as a spouse's responsibility of caring for two children. *Bagley v. Bagley*, 98 Md.App. 18, 40, 632 A.2d 229 (1993). In considering the needs of each party, the court may likewise consider that a spouse is unable to work full-time due to the special needs of his or her children.

With regard to the third factor, it is plain that Mrs. Reuter was substantially justified in bringing these proceedings. Mrs. Reuter's petition for limited divorce was necessitated by Mr. Reuter's desertion. Her petition for contempt was necessitated by Mr. Reuter's failure to comply with his court-ordered child support obligations. In light of the legal principles that we explain above, the court may have reasonably concluded that Mr. Reuter was not justified in opposing a judgment for the child support arrearage. The court also heard testimony that a $6,250 check was used, in part, to pay

Mr. Reuter's own litigation costs rather than paying some portion of his arrearage.

The trial court's ruling requires that Mr. Reuter pay less than half of Mrs. Reuter's fees—the balance, $5,449, must be paid by Mrs. Reuter. Given Mrs. Reuter's income, those fees can only be paid from her assets. The fact that Mr. Reuter may be unable to pay the fee award prior to the sale of his interest in the family home does not render the judgment unreasonable; it simply demonstrates that he temporarily lacks access to the assets needed to pay the award.

Notwithstanding those conclusions, we must vacate the award of costs and fees. The trial court failed to make the necessary findings of fact with regard to Mrs. Reuter's income, and the transcript contains evidence to suggest that the court based its rulings on an estimate of her income which was several thousand dollars lower than the numbers supported by her tax records. We have already directed the court to make the proper findings of fact. The award of attorney's fees must also be reconsidered in light of those findings.

**JUDGMENT OF THE CIRCUIT COURT WITH REGARD TO THE PAYMENT OF CHILD SUPPORT ARREARAGES IS AFFIRMED.**

**JUDGMENT OF THE CIRCUIT COURT WITH REGARD TO ALIMONY, ATTORNEY'S FEES AND CHILD SUPPORT IS VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEE.**