857 A.2d 529

**Derek T. HARVEY**

v.

**Robin Laverne MARSHALL, et al.**

**No. 0532, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Sept. 7, 2004.

Daniel L. Hatcher (Legal Aid Bureau, Inc. on the brief), Baltimore, for Appellant.

Joseph B. Spillman (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for Appellee.

Panel: DAVIS, ADKINS, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

ADKINS, J.

In this case, we decline to hold that the familiar "best interest of the child" standard overrides traditional rules of statutory construction in interpreting three inter-related statutes governing child support. Derek T. Harvey, appellant, was obligated to pay child support for his four children, as a result of 1986 and 1989 consent paternity decrees that included support awards, and other child support enforcement efforts undertaken by the Baltimore City Office of Child Support Enforcement (BCOCSE) and the Maryland Child Support Enforcement Administration (Administration), appellees.[1] Harvey accrued the child support arrearage[2] while his children were in the care of their respective mothers.

Harvey reunited with his children in 1996, and secured a court order transferring custody of them, with an effective date of October 1, 1996. Because child support enforcement actions brought by BCOCSE included arrears that accrued before 1996, Harvey filed a Motion to Set Aside Child Support (Motion) in 2002, naming the BCOCSE and the Administration as third-party defendants. After a hearing on the Motion and opposition by appellees, the Circuit Court for Baltimore City issued a Memorandum Opinion and Order denying the Motion. Harvey filed this timely appeal.

He presents the following questions for our review:

I. Did the trial court err in concluding it does not have discretion to set aside Harvey's child support arrearage, pursuant to Md.Code (1974, 1999 Repl.Vol., 2003

---

1. Because, as we explain later, the BCOCSE is a private agency performing certain functions of the Administration, we refer to both agencies when we use the term "appellees." Robin Laverne Marshall, the mother of three of Harvey's children, is only a nominal party. She assigned to the Administration her right to child support payments from Harvey as a condition of receiving welfare payments.

2. Although the past due support obligations related to more than one child and arose from more than one order, we refer to his obligations as a single "arrearage."

Cum.Supp.), section 5–1038(b) of the Family Law Article (FL)?

II. Did the trial court err in failing to apply the best interest of the child standard in determining whether Harvey's child support arrearage should be set aside pursuant to FL section 5–1038(b)?

III. Did the "Administration" and BCOCSE fail to properly exercise their discretion to forgive State-owed child support arrearage?

IV. Did the Administration fail to properly develop criteria, procedures and regulations to carry out its authority to forgive Harvey's State-owed child support arrearages pursuant to FL section 10–112?

Answering no to the first three questions, and declining to reach the fourth, we affirm the circuit court.

## FACTS AND LEGAL PROCEEDINGS

Harvey's three younger children-Dereka, Robin, and Derek, Jr.-came to live with Harvey in the fall of 1996, when their mother was no longer able to care for them. Later that same year, Harvey's eldest daughter, Keawoni, came to live with him because her mother died. Eventually, Harvey also provided a home for Kelly Williams, Keawoni's half sister, due to the death of her mother and the inability of her grandparents to care for her.

Shortly after they arrived, Harvey notified BCOCSE in person that his children were now in his custody. Harvey asked the agency to stop collecting child support and to forgive the arrearage.

Despite additional appearances at the BCOCSE office, at which Harvey allegedly requested modification of the child support order and the arrearage account, and received assurances "on several occasions that the situation would be resolved," BCOCSE continued to charge Harvey for current support and to demand payment of the mounting arrears.

BCOCSE reported the arrearage to credit reporting agencies and intercepted Harvey's tax refunds.

In the spring of 2001, Harvey, with the help of counsel from the Legal Aid Bureau, was able to have the current support obligations diverted to pay down the arrearage. Harvey's subsequent requests to BCOCSE to forgive the arrearage were unsuccessful. Harvey then turned to the Administration itself for relief.

In a June 2, 2001 letter, Harvey's counsel advised the Administration that Harvey's arrearage totaled approximately $32,000 in the two cases, with all but $1,600 owed to the State. Counsel asserted that $57 was being taken from Harvey's weekly wages under an earnings withholding order (EWO), and that this money would be better spent to support the five children who were living with Harvey.

Administration Executive Director Teresa Kaiser responded by letter dated July 6, 2001. She advised that the Administration would consider Harvey's request to abate the state-owed arrears upon receipt of additional information and court orders establishing Harvey's custody, including the length each child had resided in the Harvey household. Harvey supplied the requested information and obtained a November 20 custody order for his four children, retroactive to October 1, 1996.

The Administration then audited Harvey's account. It adjusted the account as a result of the custody order to reflect only the $5,421.26 in arrearage that existed before October 1, 1996, the date on which Harvey assumed custody. After reviewing the case, Kaiser was persuaded by Harvey's argument that his duties as custodial parent warranted "arrearage abatement ... so that he could focus on supporting his family." In a March 6, 2002 memorandum, she proposed to Dwayne Brown, BCOCSE Project Director, that the following actions be taken in this case:

1. Collect $1.00 per year on the arrears of $5,421.26;
2. Suspend the interception of State and Federal Income Taxes and other enforcement measures except for the Maryland Lottery until:

 (a) all the children are emancipated;

 (b) the non-custodial parent begins to pay child support; or

 (c) the arrears are paid completely by interceptions received through the Maryland Lottery Office.

3. Enter a narrative into the Case Action Logs stating why enforcement in this case was suspended; and

4. Refund State and Federal Taxes that were intercepted.

Kaiser asked Brown to "contact me to confirm these arrangements or to discuss other satisfactory arrangements."

BCOCSE, however, rejected the Administration proposal. Brown explained what happened:

> Once this memorandum was done, ... my supervisor, Mr. Drummond discussed this at one of our bi-weekly meetings, basically stating that we didn't agree with this proposal because ... our computer systems are not set up to read anything like this, which means that if you have $5,000.00 on the system, we don't really have much of a way to monitor these cases to make sure his taxes are intercepted or not you know turned into the credit agency. We have a lot of automated systems that are in place[.]

The Administration took no further action.

Harvey remarried in 2002, adding his wife and her son to his household. He earns $10.96 per hour as a landscaper for the City of Baltimore. He reports that he has not been able to buy a house because he cannot obtain financing as a result of the continued reporting of the arrearage to credit agencies. In addition, he asserts that "[t]he continued child support collection is harming [his] ability to pay and save for college expenses." He has one daughter in college and the rest "hope to go" someday. Harvey moved to set aside the arrearage on May 18, 2002, arguing that Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.), section 5–1038(b) of the Family Law Code (FL) gives the court discretionary authority to modify or set aside child support arrears when doing so is in the best interest of the children or when special circumstances exist.

## I.

## The Trial Court Did Not Err In Declining To Abate Or Modify Harvey's Support Payments Retroactively To A Date Prior To Harvey's Motion To Set Aside Child Support

## A.

### The Court Had No Discretion To Retroactively Extinguish The Order

Harvey argues that trial court "erred in concluding it did not have discretion to set aside Harvey's child support orders pursuant to FL section 5–1038(b)." This section, part of the Paternity Proceedings Subtitle, is titled "Finality of orders; alteration" and provides:

Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

The Administration and BCOCSE respond that the circuit court was correct in holding that it did not have authority to modify a child support order relating to a period before the filing of the motion to modify, because it is explicitly prohibited from doing so by FL section 12–104. This section, which applies to all child support actions, including paternity cases, provides:

(a) *Prerequisites.*—The court may modify a child support award subsequent to the filing of a motion for modification and upon a showing of a material change of circumstance.

(b) *Retroactivity of modification.*—The court **may not retroactively modify a child support award** prior to the date of the filing of the motion for modification. (Emphasis added.)

We hold that the trial court did not err, because we agree with appellees that FL section 12–104, limiting the time when a court can modify a support order, prohibited retroactive modification to an effective date preceding Harvey's motion.[3]

---

3. The parties dispute whether the trial court ruled on the ground that it was prohibited from this retroactive modification, or whether it exer-

We reach this conclusion by applying traditional rules of statutory construction, including consideration of legislative history.

> Judge Hollander recently summarized these rules:
>
> The seminal tenet of statutory construction compels us to ascertain and effectuate the legislative intent. . . . The statutory text is our starting point. Generally, we give the words of the statute their "ordinary and common meaning within the context in which they are used." . . . To achieve that objective, we must incorporate "the overall purpose of the statute into its interpretation." When the statutory language is "clear on its face and in its context, then we do not ordinarily need to turn to the Legislative history." In contrast, when the statute is ambiguous, we ordinarily consider the language "in light of the . . . objectives and purpose of the enactment." In this regard, "we may . . . consider the particular problem or problems the legislature was addressing and the objectives it sought to attain." To the extent "reasonably possible," we read a statute so "that no word, phrase, clause, or sentence is rendered surplusage or meaningless." Moreover, when the statute is part of a general statutory scheme or system, " 'all sections must be read together . . . to discern the true intent of the legislature.' " . . . In our effort to effectuate the Legislature's intent, we may consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' "

*Mayor of Baltimore City v. Johnson,* 156 Md.App. 569, 592–93, 847 A.2d 1190 (2004) (citations omitted).

 We are also mindful of two principles especially applicable to interpretation of two seemingly competing or conflicting statutes. "The first is that when construing two statutes that involve the same subject matter, a harmonious

---

cised its discretion on the merits, and concluded that no modification was appropriate. We do not resolve this question because we conclude that it had no discretion.

interpretation of the statutes is 'strongly favor[ed].' " *Dep't of Pub. Safety & Corr. Serv. v. Beard,* 142 Md.App. 283, 302, 790 A.2d 57, *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002)(quoting *Maryland State Police v. Warwick Supply & Equip. Co.,* 330 Md. 474, 483–84, 624 A.2d 1238 (1993)). "The second is that where two enactments—one general, the other specific—appear to cover the same subject, the specific enactment applies." *Id.*

## Modification v. Set Aside

 We are faced here with two competing, if not conflicting, statutory provisions that seemingly address the same issue. FL section 5–1038(b) authorizes the court in a paternity case to "modify or set aside **any** order as the court considers just and proper" (emphasis added), and FL section 12–104(b) prohibits a court from "retroactively modify[ing] a child support award prior to the date of the filing of the motion for modification." We are called upon to decide whether the prohibition against retroactive modification contained in FL section 12–104(b) is intended to limit the broad power to "modify or set-aside" granted in FL section 5–1038(b). More specifically, we must decide whether the prohibition against "modify[ing]" in section 12–104(b) prevents a court from granting a parent's request to eliminate a child support arrearage that accrued before the parent moved to modify the child support award. If we conclude it does, then sections 5–1038(b) and 12–104(b) conflict, and we must decide how to reconcile the two sections. Beginning our analysis by examining the plain language of the statutes, we turn to the definition of "modify." *Black's Law Dictionary* 1020 (7th ed.1999) does not include the word "modify," but defines "modification" as "1. A change to something; an alteration, <a contract modification>. 2. **A qualification or limitation of something** <a modification of drinking habits>." Applying this definition, it appears that the section 12–104 prohibition against retroactive modification also would prohibit a court from extinguishing those portions of the award that related to periods prior to the motion for modification, because to do so would be a **limita-**

**tion on the original award.** Thus, section 12–104 would conflict with the general power given in section 5–1038(b) to "modify or set aside" and we would need to decide how to reconcile the two statutes.

Harvey disagrees with this interpretation. He invites us to recognize a substantive distinction between "modify[ing]" a child support order retroactively and "setting aside" such an order retroactively. He argues that he is asking the court to "set aside" and not to "modify," because he seeks to avoid **all** of his child support arrearage. In his view, "modify[ing]" does not include "setting aside," so that "[t]he prohibition of retroactive modifications to child support orders in FL § 12–104 does not prohibit a court from setting aside the orders in their entirety pursuant to FL § 5–1038(b)."

Harvey also relies on *Black's Law Dictionary,* which defines "set aside" as "[a] judgment, decree, award, or any proceedings to cancel, annul, or revoke them at the instance of a party unjustly or irregularly affected by them." *Black's Law Dictionary* 1537 (4th ed.1968).[4] He also offers the definition of "modification" from that earlier edition of *Black's,* as "a change; an alteration which introduces new elements into the details ... **but leaves the general purpose and effect of the subject-matter intact....**" *Id.* at 1155 (emphasis added).

Although Harvey does not cite it, there is superficial support for his position in *Moore v. Jacobsen,* 373 Md. 185, 191, 817 A.2d 212 (2003), in which the Court of Appeals recently held that an agreement not to "modify" alimony would not preclude termination of alimony upon remarriage because "modification" does not equate to "termination." But the Court of Appeals based its reasoning in *Moore* in large part on FL section 11–108, which requires that alimony terminate on the recipient's remarriage, unless the parties agree otherwise. The Court considered the traditional public policy favoring

---

4. *See also Walter v. Gunter,* 367 Md. 386, 395 n. 8, 788 A.2d 609 (2002)("Vacatur is ... '[t]he act of annulling or setting aside. A rule or order by which a proceeding is vacated.' *Black's Law Dictionary* 1388 (5th ed.1979)").

termination of alimony upon remarriage, and found significant that, "[i]n contrast to modification, which requires court action, termination [under section 11–108] occurs by operation of law and thus does not require court action." *Id.* at 191, 817 A.2d 212.

In the case of child support orders, however, court action clearly is required. Thus, Harvey had to obtain judicial relief from the effects of his previously adjudicated child support orders. There is no automatic termination, even if, as in this case, physical custody of the children switches over to the parent obligor. Moreover, unlike alimony upon remarriage, there is no historical policy in Maryland favoring termination of child support arrears. On balance, we do not view *Moore* as an instruction that a judicial order eliminating all unpaid child support is a "termination" or that it cannot be a "modification" within the meaning of section 12–104.

In order for Harvey's "modification v. set aside" distinction to achieve the result he seeks, the judicial action that Harvey requests must be classified as a "set aside," and not a "modification," and the two must be mutually exclusive. Harvey, however, does not even satisfy his proffered definition of "set aside" as a judicial proceeding to "cancel, annul, or revoke [a judgment, order, etc] at the instance of a party unjustly or irregularly affected by [it]."[5] It is not unjust or irregular that Harvey be required to pay child support for periods that his children were living with their mothers and being supported by the State through welfare payments.[6]

---

**5.** We do not decide whether Harvey's argument would be more successful if his petition to modify child support payments related to periods **after** he gained custody of the children.

**6.** This is what distinguishes the present case from a case cited by Harvey, *Dep't of Revenue v. C.M.J.*, 432 Mass. 69, 731 N.E.2d 501 (2000). There, the father had always lived with the children and provided support for them. As the Supreme Judicial Court of Massachusetts observed,

> [w]hat makes this case unusual, and what has provoked this appeal, is that the defendant is not an absent father, but rather lives with and has always supported his children. Consequently, the judge's order

Indeed, Harvey is not even asserting that it is. Harvey does not challenge the paternity order or otherwise attack the validity of the original order awarding child support. His claim, rather, only relates to a **portion** of the original child support award, the payment of which affects his current family's well-being. We perceive his claim to be one for modification, in that, although the child support award was appropriate when entered, and still has a valid legal and factual basis, a portion of the award should not be enforced because his family circumstances have changed, and payment would impose a hardship for the children.

Turning from the statutory language to the statutory scheme, we must also consider the logical consequences resulting from Harvey's construction of the statute. *See Johnson,* 156 Md.App. at 593, 847 A.2d 1190. Harvey's interpretation would require us to hold the legislature intended that a court could **wipe out** 100% of an arrearage retroactively, because that is a "set aside," but that court could not **reduce** the arrearage by 99%, because that would be a "modification." This result is untenable. We reject Harvey's contention that the legality of retroactive changes to child support orders is based on the difference in the **amount** of the change. Rather, we think the distinction, **if any,** between a "modification" and a "set aside," as used in section 12–104, would rest on the **reason** for the change. *See, e.g., Jessica G. v. Hector M.,* 337 Md. 388, 401, 653 A.2d 922, *cert. denied,* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995)(prior unappealed order "dismissing the paternity action with prejudice is clearly the type of order envisioned by FL § 5–1038(b), and it may be set aside if a court finds such action 'just and proper in light of the circumstances and in the best interests of the child' "). If the child support order was invalid in the first place, then

---

for child support, paid out of the household income to the DTA, has the effect of reducing dramatically the income of the household where the children live. It is a child support order that effectively reduces support for the children who ostensibly were to benefit from it.

*Id.* at 503.

there would be reason for it to be "set aside" in its entirety.[7] If it was originally valid, but circumstances have changed, then only that part of the original award affected by the new circumstances would be changed, and it is a modification.

Our conclusion that the prohibition against retroactively "modify[ing]," as used in FL section 12–104, is intended to cover elimination of an arrearage, is also supported by legislative history, and a previous decision of this Court. In *Reuter v. Reuter*, 102 Md.App. 212, 240, 649 A.2d 24 (1994), we recognized that FL section 12–104(b) was enacted "to bring Maryland into compliance with" Federal law governing welfare funding. Legislative history reflects the same. *See Hearing on S.B. 691 before Senate Judicial Proceedings Comm.*, 1988 Gen. Assembly (Md.1988)(statement of Senator Ida G. Ruben, S.B. 691 sponsor). The pertinent Federal law mandates:

> In order to [receive certain Federal funding] . . ., each State must have in effect laws requiring the use of . . . . [p]rocedures which require that any payment or installment of support under any child support order . . . is . . **not subject to retroactive modification** by such State or by any other State; except that such procedures may permit modification with respect to any period during which there is pending a petition for modification, but only from the date that notice

---

7. In *Walter v. Gunter*, 367 Md. 386, 394, 788 A.2d 609 (2002), the Court of Appeals held that FL section 5–1038(b) does not apply when the underlying paternity order is invalidated, because the court's jurisdiction under section 5–1038(b) depends on the existence of a valid paternity order. *Walter* differs from this case because it involved a successful challenge to the paternity order itself, rather than a challenge to the child support order, as we have here. By its terms, FL section 12–104 prohibits only retroactive changes to "a child support award" and does not limit a trial court's authority to retroactively vacate an invalid paternity declaration, for the reasons set forth in *Walter*. *See id.* at 390–94, 788 A.2d 609. The analysis in *Walter*, however, leaves open the question of whether, under FL section 5–1038(b), a court could retroactively "set aside" a child support order, when the underlying paternity order is valid, and still comply with FL section 12–104.

of such petition has been given ... to the obligee or (where the obligee is the petitioner) to the obligor.

42 U.S.C. § 666(a)(9)(2004).

Ann C. Helton, then Executive Director of the Administration, testified before the Maryland Senate Judicial Proceedings Committee that Maryland was notified on December 8, 1997, that the Director of the Federal Office of Child Support Enforcement intended to disapprove Maryland's State Plan for Child Support because of "failure to enact legislation prohibiting retroactive modification of child support orders." *See Hearing on S.B. 691 before Senate Judicial Proceedings Comm.*, 1988 Gen. Assembly (Md.1988)(statement of Ann C. Helton). This failure would "result in a total withdrawal of Federal funding for the program ($23.1 m[illion]) and a possible penalty against [Maryland's] AFDC program of from 1% to 5% of its share of Federal funds ($1.2 to 6 m[illion])." *Id.*

Helton also testified that "[t]he intent of Congress [in enacting section 666(a)(9) ] was specifically aimed at the practice of some courts to reduce or forgive arrearages." *Id. See also Ruben Statement, supra* (when dealing with support arrears before proposal of S.B. 691, Maryland courts "usually wipe[d] out the previous debt and allow[ed] the payor to start anew with child [s]upport payments"). Helton further explained that "[c]ollection of those overdue amounts means not only that the children, often living on a marginal income in single parent households, will benefit, but that the burden on the taxpayer is reduced through offset in expenditures for AFDC." *Id.*

After examining the statute in light of this legislative scheme and history, we conclude that the legislature, in using the term "modify" in FL section 12–104 simply followed the language of the Federal statute, intending to prohibit, *inter alia*, the courts from wiping out an arrearage accrued during periods before the filing of a motion for modification. Thus, we reject the interpretation advanced by Harvey—that the legislature intended that the FL section 12–104 prohibition

does not apply when a court is asked to wipe out an arrearage retroactively. Although we recognize that, when construing two statutes that involve the same subject matter, "a harmonious interpretation" of the statutes is "strongly favor[ed]," *Md. State Police*, 330 Md. at 483–84, 624 A.2d 1238, we conclude there is a conflict here because FL section 5–1038(b) seemingly permits a court to retroactively extinguish an arrearage, whereas FL section 12–104 prohibits that.[8]

## FL Section 12–104 Controls

Having decided that the prohibition against retroactive modification in FL section 12–104 precludes a judicial order that FL section 5–1038(b) otherwise allows, we still must decide which one is applicable to our case. We do so by returning to the principles of legislative construction regarding competing statutes, one general and one specific. Section 5–1038(b) is more general in that it addresses the court's broad authority, in paternity cases, to issue orders that "modify or set aside any order or part of an order under [the paternity proceedings] subtitle," except a declaration of paternity. This, of course, would include a child support order, as well as other orders.[9] In contrast, FL section 12–104(b), is the more specific provision because it addresses **when** those

---

**8.** We are not persuaded by Harvey's argument that FL section 5–1038(b) implies that the legislature intended to carve out an exception to FL section 12–104 for paternity cases generally. This is inconsistent with the legislative intention to preclude reductions in child support arrearages, whether in paternity cases or otherwise. FL section 5–1002(b)states that the legislative purpose of the paternity subtitle is, in part, "to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support [and] care ... as children born in wedlock[.]" If we held that a child support arrearage pertaining to a child born out of wedlock could be retroactively extinguished, but an arrearage to all other children could not, we would undermine this fundamental purpose.

**9.** Paternity orders subject to Section 5–1038(b) include: the medical support of the child pursuant to Section 5–1033(a), the attorneys fees of the complainant pursuant to Section 5–1033(c)(2), and visitation privileges or custody pursuant to Section 5–1035(a).
*Walter*, 367 Md. at 395 n. 7, 788 A.2d 609.

orders can be made in cases involving child support. "[W]here there is a specific enactment and a general enactment which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.'" *Dep't of Natural Res. v. France*, 277 Md. 432, 461, 357 A.2d 78 (1976)(quoting *Criminal Injuries Comp. Bd. v. Gould*, 273 Md. 486, 495, 331 A.2d 55 (1975))(quotation marks omitted).

But we do not rely solely on the *"specific v. general"* distinction to interpret these statutes. In addition to section 12–104(b) being the more specific enactment, it is also the later enactment. FL section 12–104 was enacted in 1988, at a time when FL section 5–1038(b) had long been in existence. *See* 1988 Laws, ch. 338; *Adams v. Mallory*, 308 Md. 453, 462, 520 A.2d 371 (1987)(examining section 5–1038(b)); 1984 Md. Laws, ch. 296 § 2 (recodification).

When attempting to harmonize two statutes that address the same subject, we presume that when the legislature enacted the later of the two statutes, it was aware of the one enacted earlier. "Even though two statutes may require conflicting results with regard to their common subject, they are not rendered thereby necessarily irreconcilable." *Gallaudet Univ. v. Nat'l Soc'y of the Daughters of the Am. Revolution*, 117 Md.App. 171, 200–01, 699 A.2d 531 (1997)(quoting *Gov't Employees Ins. Co. v. Ins. Comm'r*, 332 Md. 124, 133, 630 A.2d 713 (1993)).

In this instance, the General Assembly was aware of section 5–1038(b) when it enacted section 12–104. The problem targeted by section 12–104 was identified as the courts' too frequent exercise of discretion to "wipe[ ] out the previous debt[.]" *See Ruben Statement, supra.* That troublesome judicial discretion is the product of section 5–1038(b).

Thus, the legislative history shows that the 1988 General Assembly enacted FL section 12–104 in order to deliberately circumscribe the broad judicial discretion afforded under FL

section 5–1038(b), in a successful effort to preserve Federal funding for Maryland welfare programs. We hold that the circuit court properly construed FL section 12–104 as a limitation on the earlier enacted and more generally applicable FL section 5–1038(b), preventing courts from modifying or setting aside any child support arrearage that accrued before an obligor parent petitions for modification.

## B.

### FL Section 10–118 Does Not Override Traditional Statutory Construction Principles In Interpreting Sections 12–104 and 5–1038(b)

FL section 10–118 provides:

> Subject to any federal law or program, the Administration and local support enforcement offices shall promote and serve the best interests of the child in carrying out their child support responsibilities under this subtitle.

Without specifically saying so, Harvey seems to be arguing that the best interest of the child principle, as embodied in section 10–118, must override any interpretation of FL sections 5–1038(b) and 12–104 under traditional principles of statutory construction. He advances:

> The legislative history [of FL sections 10–118 and 5–1002] reflects that the law was formed on the bedrock principle in Maryland that the best interest of the children is the controlling factor in matters affecting the children.

He also relies on various Maryland decisions recognizing the importance of the best interest of the child standard:

> The enforcement of the child support orders and resulting state-owed arrearages is taking money from the household of the children the order was meant to support, harming Mr. Harvey's ability to support his children, harming his credit history and ability to obtain needed financing, and harming his ability to save money in order to put his children through college.... In fact, the best interests of the child is such a fundamental guiding principle in Mary-

land, that it is given even greater importance than a parent's constitutionally protected fundamental liberty interest in the parent-child relationship. *In re Adoption/Guardianship No. 11137*, 106 Md.App. 308, 316, 664 A.2d 443 (1995).

Harvey's contentions may be answered most simply by reference to the language directing the Administration to apply the best interest of child standard, but to do so "[s]ubject to any federal law or program[.]" As we have previously explained, the Federal welfare funding statute requires that there be no retroactive modification of child support orders, and section 12–104 complies with that directive.

Moreover, we do not agree with Harvey that this interpretation is consistent with the principles underlying the best interest standard. Although a child's best interest will override a parent's fundamental right in the context of decisions regarding custody and adoption, here we are not evaluating the many and weighty factors that enter into a decision regarding with whom a child will live, and who makes decisions on behalf of that child. We are simply deciding whether a child's father should be able to avoid repaying a judicially established debt that he owes to the State. *See infra* section II. In this context, the best interest of the child does not override the statutory mandate of FL section 12–104.

For these reasons, the circuit court was correct in concluding it did not have discretion to set aside Harvey's child support arrears pursuant to FL section 5–1038(b). Nor, as we explain below, did it err in declining to apply the statutory best interest of the child standard established in FL section 10–118.

## II.

### The Administration Was Not Obligated To Apply The Best Interest Of The Child Standard In Exercising Its Discretion Under FL Section 10–112

Harvey again invokes the best interest of the child standard, this time arguing that it governs the Administra-

tion's exercise of discretion under FL section 10–112(a) in determining whether to settle with him by accepting a lesser sum than the adjudicated amount of his arrearage. This section reads:

> If the Administration considers it to be in the best interest of this State, in a case in which an assignment has been made under Article 88A, section 50(b)(2) of the Code, the Administration may accept in full settlement of an arrearage in child support payments an amount that is less than the total arrearage.

Harvey claims that the exercise of discretion under FL section 10–112 must be guided by the mandate of FL section 10–118, requiring the Administration and local support enforcement agencies to "promote and serve the best interests of the child in carrying out their child support responsibilities under this subtitle." We disagree with Harvey, and hold that the best interest of the child standard does not govern the exercise of discretion under FL section 10–112.[10]

We again start our analysis with the plain language of the statute. *See Thrasher v. Homecomings Fin. Network, Inc.,* 154 Md.App. 77, 82, 838 A.2d 392 (2003), *cert. denied,* 380 Md. 619, 846 A.2d 402 (2004). FL section 10–112 specifically says that the Administration may settle "[i]f the Administration considers it to be in the best interest of this State," and notably omits any mention of the best interest of the child. If the legislature meant that the child's interest was the governing factor, or even a required[11] consideration, it likely would have said so. *See, e.g., In re Anthony R.,* 362 Md. 51, 62, 763 A.2d 136 (2000)(citing absence of explicit language as grounds for statutory interpretation); *Sec'y of Public Safety v. Hutchinson,* 359 Md. 320, 329, 753 A.2d 1024 (2000)(same). When the legislature intends to mandate competing factors an agen-

---

**10.** Harvey also relies on FL section 5–1002. *See supra* n. 8. We see nothing in this section inconsistent with our holding in this case.

**11.** We are not holding that the Administration may not take into account a family's hardship in deciding whether to settle its claim under section 10–112. That is an issue we do not reach.

cy must take into account in determining the interest of the State, it knows how to do so. *See, e.g.,* Md.Code (1982, 1996 Repl.Vol., 2003 Cum Supp.), § 16–202(c)(1) of the Environment Article (in deciding whether to issue a license to dredge or fill on State wetlands, Board of Public Works "shall decide if issuance of the license is **in the best interest of the State, taking into account the varying** ecological, economic, developmental, recreational, and aesthetic values each application presents")(emphasis added).[12] The plain language of FL section 10–112 strongly suggests that we should reject Harvey's claim.

In further considering Harvey's argument, we are mindful that FL section 10–112 only applies when one parent has assigned his or her rights to recover child support payments from the other parent as a condition of receiving welfare payments under Md.Code (1957, 2003 Repl.Vol.), Art. 88A § 50(b)(2).[13] Thus, the Administration and local support en-

---

**12.** Numerous other times, the General Assembly has used simply the phrase "best interest of the State," when the context clearly intended financial considerations only. *See, e.g.,* Md.Code (1991, 1999 Repl.Vol.) § 8–635 of the Labor & Employment Article ("If the Secretary determines that the **best interests of the State** will be served, the Secretary may: (1) adjust, compromise, or settle any claim or judgment for a contribution, reimbursement payment, or interest assessed against an employing unit; (2) accept a lesser amount; or (3) issue a release of claim or satisfaction of judgment"); Md.Code (1985, 2001 Repl.Vol.), § 6–219(d) of the State Finance & Procurement Article (SFP)(Comptroller may settle claim "to best serve the interests of the State"); SFP § 8–131.1(h) ("This section does not prevent the Board from authorizing the issuance and sale of State bonds the interest on which is not excludable from gross income for federal income tax purposes if the Board in its authorizing resolution finds that to be in the best interests of the State"); SFP § 13–222(c)(Board may waive requirements established for bidders for State procurement contract "if the Board determines that (1) the procurement is essential or **in the best interests of the State;** and (2) there is no other known source for the procurement at a reasonable cost").

**13.** This statute conditions the payment of certain welfare benefits upon the applicant or recipient assigning "to the State all right, title, and interest in support from any other person that the applicant or recipient has on behalf of any intended or potential recipient for whom the applicant or recipient is applying for or receiving assistance, including any right accrued when the assignment is executed."

forcement offices are collecting money that **will be returned to the state coffers.** They are **not collecting support from one parent that will go to the other parent to benefit a child.** For this reason, we conclude that, in exercising its discretion under section 10–112, the Administration and local support enforcement offices are not "carrying out a child support responsibilit[y] under [the] subtitle," as described in FL section 10–118. Rather, section 10–112 simply gives the Administration the authority to settle a claim to payment that it has acquired by assignment from a parent.

As the Administration argues, section 10–112 "merely grants authority to [the Administration], that . . . would otherwise rest with the Comptroller, to settle litigation involving child support arrears assigned to the State if the agency concludes that it is in the State's interest to accept a lump sum payment." *Cf.* Md.Code (1985, 1999 Repl.Vol.), § 6–219 of the State Finance & Procurement Article (SFP)(Comptroller may "settle a claim so as to best serve the interests of the State"). The language and existence of FL section 10–118, in our view, only reinforces the plain language interpretation of FL section 10–112. The legislature, knowing that section 10–118 required the Administration and any local enforcement office to act in the best interest of the child with respect to many of its functions, explicitly directed that, with respect to **this** function, the Administration must consider the best interests of the State.

■ We are not persuaded otherwise by Harvey's arguments. We recognize that "the plain meaning rule is 'elastic, rather than cast in stone[,]' and if 'persuasive evidence exists outside the plain text of the statute [pertaining to the meaning of a provision] we do not turn a blind eye to it.' " *Corby v. McCarthy,* 154 Md.App. 446, 449, 840 A.2d 188 (2003)(quoting *Adamson v. Corr. Med. Serv.,* 359 Md. 238, 251, 753 A.2d 501 (2000)). Resisting the plain language approach, Harvey invokes the **common law** doctrine that "the best interest of the child standard governs child support matters." We do not question the vitality of this doctrine, but find it is inapplicable

to the Administration's exercise of discretion under section 10–112.

The doctrine has ordinarily been applied when the issue in the case involves determining how much child support a parent should pay to the other parent for the benefit of a child, not in instances when the State is collecting money owed to it from a parent. This was true in *Witt v. Ristaino*, 118 Md.App. 155, 158, 169, 701 A.2d 1227 (1997), and *O'Connor v. O'Connor*, 22 Md.App. 519, 522, 323 A.2d 632 (1974), both cases cited by Harvey, involving determinations of whether a father should be required to pay child support in an amount sufficient to cover costs of private school. Harvey cites no case, however, holding or suggesting that the best interest of the child is the appropriate standard when the State is collecting a debt from a parent owing to the State.[14]

We are not persuaded that the "child's best interest" standard should be invoked solely because the State stands in the shoes of a custodial parent claiming child support (by virtue of an assignment from the children's mother). Although the best interest standard governed at the time the child support order was originally established, the case now stands in a different posture. If Harvey had an argument that the support amount was too high at a time when he was **not** the custodial parent, he could have advanced it then. He also had a full opportunity to seek modification of the original order, and he was limited only by the prohibition of FL section 12–104 against modification of support accrued before he filed the petition to modify. But his opportunity to challenge the award on a child's best interest standard passed him by when the order making the award became final, and was not appealed. *See*

---

**14.** The only other case cited by Harvey to support this point was *Miller v. Miller*, 142 Md.App. 239, 254, 788 A.2d 717, *aff'd sub nom. Goldberg v. Miller*, 371 Md. 591, 810 A.2d 947 (2002). There we held that the trial court lacked authority to treat guardian ad litem fees imposed in divorce proceeding as "child support," so that fees could be collected through garnishment of federal retirement annuity under applicable Federal statutes. *See id.* at 256, 788 A.2d 717. We see no support for Harvey in this case.

*Reuter v. Reuter*, 102 Md.App. 212, 241, 649 A.2d 24 (1994)("The Maryland rule allowing modification only upon a showing of changed circumstances is consistent with broader principles of *res judicata* ").

Nor are we persuaded by Harvey's argument that the best interest standard must control simply because his children might now be adversely affected if he is required to pay his debt to the State. Although we are sympathetic to the family's financial needs, and concur with the circuit court's commendation of Harvey for his ambition to make a better life for his children, we will not direct the Administration to compromise its claim on this ground. Legislation imposing taxes, user fees, and even criminal fines might be argued, in some instances, to be against the "best interest" of the children in the family obligated to pay. We cannot extinguish such obligations simply because children might be financially affected by them.

## III.

### The Administration Did Not Fail To Properly Exercise Its Discretion Under FL Section 10–112

Harvey next seeks to invoke this Court's assistance in forcing the Administration to exercise its discretion under FL section 10–112. He argues that the Administration failed "to act on his request to forgive state-owed arrears[.]" He contends that "[t]he trial court erred as a matter of law in refusing to review the agency's exercise of discretion." In his view, "[t]he discretion provided to [the Administration] under FL [section] 10–112 is subject to judicial review, regardless of whether review is provided for by statute."

### Limited Judicial Review

There is no provision for judicial review of decisions by the Administration under FL section 10–112. Nor is Harvey entitled to judicial review of the Administration's decision as a "contested case" under Maryland's Administrative Procedure Act. *See* Md.Code, (1984, 1999 Repl.Vol., 2003

Cum.Supp.), § 10–201 *et seq.* of the State Government Article (SG)(the APA)(defining "contested case" in § 10–202(d) as "a proceeding before an agency to determine [*inter alia* ] a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing").

■ Courts will review administrative actions, however, even if the action is non-adjudicatory and the APA does not apply. In *Hurl v. Bd. of Educ. of Howard County,* 107 Md.App. 286, 304, 667 A.2d 970 (1995), for example, we reviewed a superintendent's decision to transfer a teacher to another school "as the needs of the schools require," pursuant to Md.Code (1978, 2004 Repl.Vol.), section 6–201(b)(2)(ii) of the Education Article. In that context, we explained that, even in the absence of statutory authorization for judicial review, "the circuit court nonetheless retains the power to review agency decisions to prevent illegal, unreasonable, arbitrary or capricious administrative action." *Id.*

But Harvey's complaint does not qualify for that kind of relief because it is about a **failure or refusal** to take administrative action. Harvey asks us to remedy the Administration's failure or refusal to invoke FL section 10–112, by taking an action to "accept in full settlement of an arrearage in child support payments an amount that is less than the total arrearage." Although an agency's refusal or failure to make a decision may justify mandamus relief in some instances, *see Kerpelman v. Disability Review Bd.,* 155 Md.App. 513, 528, 843 A.2d 877 (2004)(awarding mandamus relief for failing to determine whether claimant had qualifying disability), we do not see how mandamus could be applied to this case.[15]

■ The Court of Appeals has explained that the writ of mandamus " 'is a summary remedy for the want of a specific one, where there would otherwise be a failure of justice. It is based upon reasons of justice and public policy, to preserve

---

**15.** We observe that Harvey has not explicitly requested a writ of mandamus, although that seems to be what he is seeking.

peace, order and good government.'" *Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 707–08, 752 A.2d 200 (2000) (citations omitted). We see no failure of justice, lack of order, or lack of good government in this instance because we do not think that the legislature, in enacting section 10–112, intended that the Administration be required to actively consider, in every case in which it is collecting a child support arrearage pursuant to an assignment under Article 88A, section 50(b)(2), whether compromise and settlement is appropriate.

> [M]andamus, as generally used, is to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right.

*Criminal Injuries Compensation Bd. v. Gould,* 273 Md. 486, 514, 331 A.2d 55 (1975).

FL section 10–112 did not create a clear right in persons such as Harvey, who are obligated to pay arrears accrued under adjudicated child support orders. Harvey's right to challenge the legitimacy of claims by the children's mother existed earlier, when Harvey was sued to establish support; he had an opportunity to defend through a full judicial hearing and appellate review.

Nor was section 10–112, in our view, intended to impose a **duty** upon the Administration to compromise, or to consider compromise, in every case. The authority under this section, rather, could be invoked when the Commission, in its discretion, elected to do so. The broad nature of the discretion intended by the legislature is revealed in its omission of any criteria to be considered, other than the general "best interest of the State" criteria.

### No Illegality Or Unreasonableness

Even if we were to consider the Administration's action in proceeding with the usual enforcement mechanisms for collection of a child support arrearage as a decision or action that

must be reviewed, our " 'inquiry is (almost always) limited to finding whether there was illegality or unreasonableness in the ... action—when that inquiry is finished, judicial scrutiny ends[.]' " *Dep't of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 226, 334 A.2d 514 (1975) (citation omitted). For the reasons discussed below, we find no illegality or unreasonableness.

Harvey argues that the BCOCSE refusal to forgive his arrearage was illegal, in part, because BCOCSE "admitted it was placing its own interests in maintaining its collection rate before the interests of the children when it refused to take the actions suggested by [the Administration] to effectively suspend enforcement." A representative of BCOCSE acknowledged that "one of the reasons" it rejected the Administrations's proposal "is that it would potentially harm the numbers that show the local enforcement offices's collection rate[.]" She also explained BCOCSE's other reasons:

> We'd rather go one way or the other.... Either collect the money at a reasonable rate ... or [abate the arrears].... [O]nce this memorandum [from the Administration recommending $1.00 per year] was done, ... my supervisor ... discussed this at one of our bi-weekly meetings, basically stating that we didn't agree with this proposal because (1) our computer systems are not set up to read anything like this, which means that if you have $5,000.00 on the system, we don't really have much of a way to monitor these cases to make sure his taxes are intercepted or not turned into the credit agency. We have a lot of automated systems that are in place—

We examine the legitimacy of these reasons in light of the statutory language of section 10–112, and inspect how the statute relates to other laws. *See Thrasher*, 154 Md.App. at 82, 838 A.2d 392. We begin with a review of the Administration's role in collecting a child support arrearage owed to the State, as well as the relationship between the Administration and BCOCSE.

The Administration is a sub-department within the Department of Human Resources. *See* FL § 10–106. BCOCSE is a private agency that has contracted with the Administration to carry out the Administration's responsibilities in collecting child support. The Administration's authority to delegate some of its duties to a private agency is statutorily defined:

> [T]here is a Child Support Enforcement Privatization Pilot Program within the Department [of Human Resources] . . . [which will] operate in Baltimore City . . . The purpose of the Pilot Program is to authorize the Secretary of the Department to enter into contracts with private companies to privatize all aspects of child support enforcement functions of the Department, . . . collecting support payments[.]

FL § 10–119.1(a)–(b).

The legislative history of the current privatization pilot in Baltimore City suggests that the legislature, in enacting FL section 10–119.1, expected to increase revenues for the State. *See Appropriations Committee Floor Report*, 1995 Gen. Assembly, H.B. 1177 (Md.1995)("With the majority of cases in the City also on AFDC, uncollected support orders result in additional AFDC costs for the [S]tate. . . . [B]y contracting this service out, enforcement functions can be run in a more efficient manner"). The legislature also enacted FL section 10–119.2, which directs the Secretary of Human Resources to "establish child support demonstration sites in all jurisdictions that are not privatized jurisdictions, for the purpose of competing against a privatized jurisdiction as established in § 10–119.1[.]"

The legislature's focus on efficiency and success in collecting child support monies owed to the State is not new. In 1978, the General Assembly transferred responsibility for support collections to the Department of Human Resources. *See* 1978 Md. Laws, ch. 885. In proposing this change, the Department stated: "The Department . . . has the incentive to manage the Domestic Collections program well. Collections efforts on behalf of welfare clients can substantially cut the payout of welfare funds." *House Committee on Appropriations Hear-*

*ing on H.B. 607,* 1978 Gen. Assembly (Md.1978)(statement by Roger P. Winter, Ass't Sec'y of Human Resources). In 1980, the General Assembly authorized interception of State tax refunds to parents who owe child support, initially only for support payments due to persons receiving AFDC. *See* 1980 Md. Laws, ch. 569. In 1985, the General Assembly permitted earnings withholding orders against parents who are more than 30 days in arrears on child support, and the fiscal note for that legislation reflected an "estimated $462,292 in AFDC offset funds . . . in FY 86." *See Fiscal Note on H.B. 618,* 1985 Gen. Assembly (Md.1985); 1985 Md. Laws, ch. 329.

Further, as the Administration argues, "the Court of Appeals has consistently recognized that [one] prime object of Maryland's paternity statutes has been to protect the public from the burden of government support for a child." *See Commonwealth of Va. ex rel. Halsey v. Autry,* 293 Md. 53, 61, 441 A.2d 1056 (1982)(one purpose of Paternity Act is to shift burden of support from the taxpayers to parents of children born out of wedlock); *Mayor of Rockville v. Randolph,* 267 Md. 56, 61, 296 A.2d 574 (1972)(main purpose of this law is to shift " 'some of the burdens of financial support of illegitimates from the taxpayer to the father' ") (citation omitted). *See also Pickett v. Brown,* 462 U.S. 1, 10, 103 S.Ct. 2199, 2205, 76 L.Ed.2d 372 (1983)(State interest in paternity cases "stems not only from a desire to see that 'justice is done,' but also from a desire to reduce the number of individuals forced to enter the welfare rolls").

Keeping in mind this history of legislative efforts to identify more effective means to collect child support payments as a way to increase revenues to the State, we examine the history of the agency's response to Harvey's requests that his debt be reduced or extinguished, and the reasons why they were not granted. As stated in the letter from Ms. Kaiser, the Administration recommended to BCOCSE that it suspend enforcement measures against Harvey "except for the Maryland Lottery," collecting only $1.00 per year from Harvey, until all of his children were emancipated. In a meeting after BCOCSE received the Administration's recommendation, how-

ever, BCOCSE stated its rejection of that proposal. Thereafter, the Administration took no steps under section 10–112 to settle or compromise its adjudicated claim against Harvey. Thus, the Administration, acquiescing in its local agency's objections, elected not to invoke section 10–112.

In enacting the pilot program to privatize the Administration's "child support enforcement functions," the legislature evidently sought to take advantage of efficiencies achievable in private enterprise as compared to government operations. In delegating such responsibility, it was obviously necessary to give the private company financial incentives to perform the work. The record in this case suggests that one of BCOCSE's financial incentives was measured by its "collection rate" with respect to child support arrears. Harvey complains that BCOCSE, in deciding whether to compromise the State's claim against Harvey, was motivated by the impact of such compromise on its own "collection rate," and that such motivation makes its action illegal or unreasonable.

We are persuaded that this motivation is a legitimate one in this context, because financial incentives for performance and achievement are an integral part of private enterprise. The legislature, in enacting FL section 10–119.1, undoubtedly understood that when a private company undertakes to collect monies owed to the State, its success in doing so may benefit both the company and the State. Although this financial incentive may work to the detriment of a debtor like Harvey, as well as his children, it also may work to the benefit of the State's citizens as a whole. The financial health of the State affects almost every citizen, including children, whether he or she benefits from an increase in services offered, a decrease in taxes paid, or both.

Through the use of pilot programs, the legislature has decided to investigate whether private companies can better serve the State in this arena than a traditional State agency. A predictable and necessary consequence of this decision is that the financial incentives offered to the company will motivate its behavior. In the context of exercising discretion

whether to settle a claim under section 10–112, we think a financial incentive in favor of collection reflects neither illegality or lack of reason.

The other reason given by BCOCSE for rejecting the Administration's proposal was that its computers are not capable of tracking an account that shows money owed from an individual, without automatically taking enforcement steps, such as intercepting the individual's tax refunds. Although it is understandably frustrating to an individual like Harvey to have his financial well-being dictated by the limitations of an high volume, automated system, we cannot say that this reason is arbitrary. The Administration and BCOCSE, like many other government offices and private businesses, have decided that computer operated databases are the most efficient and effective manner in which to accomplish their tasks. The advantages of an automatic computerized system must be offset against the disadvantages, including the disadvantage of losing individualized treatment. In the context of this case, we cannot say that it is unreasonable for the Administration to conclude that some sacrifices must be made to achieve the benefits of a computerized system.[16]

Many states have statutes authorizing officials to compromise claims of the state or debts owed to the state. Federal law contains similar authority. We have found no case, however, holding that a person owing an adjudicated debt to a state has the right to compel the state to compromise that debt. We see no reason to do so in this instance.

## IV.

### Harvey Failed To Properly Submit A Petition For The Adoption Of A Regulation

Harvey's final complaint is that the Administration has failed "to properly formulate criteria or regulations to govern the procedures in exercising agency discretion under FL

---

16. We observe that Harvey makes no allegation of illegal discrimination.

[section] 10–112." The Administration responds that the circuit court lacked authority to enter a declaratory judgment or an injunction requiring a State agency to issue regulations because Harvey did not proceed under SG section 10–123(a), which allows "[a]n interested person [to] submit . . . a petition for the adoption of a regulation."

■ We agree with the Administration, finding decisions under the Federal APA and similar state statutes persuasive. *See, e.g., South Hills Health Sys. v. Bowen,* 864 F.2d 1084, 1095 (3d Cir.1988)("a threshold requirement of seeking judicial review of an agency's refusal to undertake rulemaking is the filing of a rulemaking petition with the relevant agency"); *Kappelmann v. Delta Air Lines, Inc.,* 539 F.2d 165, 171 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977)(refusal to review agency's decision not to issue regulation without filing rulemaking petition, because "[t]o do so would be to 'short circuit' the path mandated by Congress and leave the court without the full record of the agency's reasons for refusing to adopt such a regulation"); *N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.,* 117 F.Supp.2d 211, 236 n. 50 (N.D.N.Y.2000), aff'd, 267 F.3d 128 (2d Cir.2001)("failure to file such a petition deprives a court of subject matter jurisdiction to review the claim," citing *South Hills* ); *Midwater Trawlers Co-op. v. Mosbacher,* 727 F.Supp. 12, 15–16 (D.D.C.1989)(refusing judicial review because there was no petition for rulemaking and no ruling by agency); *Beneficial N.C., Inc. v. State ex rel. N.C. Banking Comm'n,* 126 N.C.App. 117, 484 S.E.2d 808, 811 (1997)(refusing to review agency's failure to engage in rulemaking under state statute permitting any person to submit a petition requesting the adoption of a rule where no petition filed, because " 'when the legislature has established an effective administrative remedy, it is exclusive' ") (citation omitted).

## Conclusion

For the foregoing reasons, we affirm the decision of the circuit court.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**